IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH A. CRAFT et al., | ) |
| Plaintiffs, | ) |
| v. | ) No. 14 C 5853 |
| HEALTH CARE SERVICE CORPORATION, | ) Judge Virginia M. Kendall |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Before the court is defendant Health Care Service Corporation's ("HCSC") motion to dismiss. For the following reasons, the court denies HCSC's motion.

Plaintiff Elizabeth A. Craft is an employee of Trustwave Holdings, Inc. and a participant in The Trustwave Holdings, Inc. Health Care Benefit Plan (the "Trustwave Plan"). (Compl. ¶ 3.) Defendant HCSC, operating as Blue Cross and Blue Shield of Illinois, administers and insures the plan. (Id. at ¶ 2.) Doctors have diagnosed Craft's 16-year-old daughter, plaintiff Jane Doe, with post-traumatic stress disorder, recurrent, severe major depressive disorder, and anorexia nervosa. (Id. at ¶ 12.) Since August 2012, Jane has been hospitalized nine times for acute in-patient care to treat her mental illness. (Id. at ¶ 13.) On each occasion, Jane's treating physicians have recommended that she be transferred to a long-term residential treatment center ("RTC") upon discharge from the hospital. (Id. at ¶ 14.) On July 17, 2014, HCSC denied Craft's request to preauthorize RTC treatment pursuant to the following exclusion in the Trustwave Plan ("the RTC exclusion"):

> Expenses for the following are not covered under your benefit program . . . Residential Treatment Centers, except for Inpatient Substance Abuse Rehabilitation Treatment . . . .

(Trustwave Plan, attached as Ex. 1 to Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem."), at 90, 93.)[1] There is no corresponding exclusion for treatment of medical and surgical conditions in similar residential facilities (e.g., "Skilled Nursing Facilities"). (See id. at 57; see also Compl. ¶ 1.) The plaintiffs claim that this exclusion violates provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") requiring parity between mental-health and medical/surgical benefits. (Compl. ¶ 1.) HCSC has moved to dismiss plaintiffs' complaint on the ground that the statute did not apply to "treatment settings" during the relevant time period.

## LEGAL STANDARD

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" Thulin v. Shopko Stores Operating Co., LLC, 771 F.3d 994, 997 (7th Cir. 2014) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). "Whether a complaint states a claim upon which relief may be granted depends upon the context of the case and 'requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). The court accepts the complaint's well-pleaded allegations as true and construes them in the light most favorable to the plaintiffs. Id.

---

[1] The plaintiffs refer to the Trustwave Plan throughout their complaint, and it is central to their claims against HCSC. (See, e.g., Compl. ¶¶ 1, 11, 15-16, 19, 22, 38.) Thus, the court may consider it without converting HCSC's motion into a motion for summary judgment. See Burke v. 401 N. Wabash Venture, LLC, 714 F.3d 501, 505 (7th Cir. 2013) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.") (citation and internal quotation marks omitted).

## DISCUSSION

### I. The Parity Act

In 1996, Congress enacted the Mental Health Parity Act of 1996 ("MHPA"), which required group health plans to impose the same aggregate lifetime and annual dollar limits for mental health benefits that such plans impose on medical/surgical benefits. See MHPA, Pub. L. No. 104–204, 110 Stat 2874 (current version at 29 U.S.C. § 1185a).[2] In 2008, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"). See Parity Act, PL 110–343, 122 Stat 3765 (codified at 29 U.S.C. § 1185a). The Parity Act extended the MHPA's parity requirement to encompass: (1) "financial requirements" (e.g., copayments and deductibles); and (2) "treatment limitations." 29 U.S.C. § 1185a(a)(3)(A)(i)-(ii), (B)(i). "The term 'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." Id. at § 1185a(a)(3)(B)(iii). To comply with the Parity Act, a plan must ensure that: (1) the treatment limitations applicable to mental-health benefits are "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage);" and (2) "there are no separate treatment limitations that are applicable only with respect to [mental-health benefits]." Id. at § 1185a(a)(3)(A)(ii). Before the Act became effective for most plans, the Departments solicited comments from interested parties regarding the statute's application. See Request for Information ("RFI") Regarding the Parity Act, 74 Fed. Reg. 19155 (Apr. 28, 2009). Among other things, the

---

[2] The MHPA amended portions of ERISA, the Public Health Service Act, and the Internal Revenue Code. See Preamble, Interim Rules for Mental Health Parity, 62 Fed. Reg. 66932-01, 66933 (Dec. 22, 1997). Three agencies — the Department of Labor, the Department of Health and Human Services, and the Department of the Treasury — are responsible for administering the statute. Id. The court will refer to these agencies collectively as the "Departments."

Departments asked interested parties to address treatment limitations other than those enumerated in the statute itself. Id. at 19157.

### A. Interim Final Rules

After receiving responses to their RFI, the Departments published interim final rules ("IFRs") in lieu of soliciting comments on a proposed rule. The Departments reasoned that the IFRs were necessary because "without prompt guidance some members of the regulated community may not know what steps to take to comply with" the Parity Act's requirements. See Preamble, IFRs Under the Parity Act, 75 Fed. Reg. 5410-01, 5419 (Feb. 2, 2010). The IFRs applied the term "treatment limitations" to both "quantitative" and "nonquantitative" limitations. 29 C.F.R. § 2590.712 (amended Jan. 13, 2014).[3] With respect to particular "types" of limitations — e.g., copayments — the IFRs required parity between mental-health benefits and medical/surgical benefits within the same "classification." Id. at § 2590.712(c)(1)(i)-(ii). The IFRs established six such classifications: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. Id. at § 2590.712(c)(2)(ii). The IFRs included an "[i]llustrative list" of types of nonquantitative treatment limitations:

> Nonquantitative treatment limitations include:
>
> > (A) Medical management standards limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative;
> >
> > (B) Formulary design for prescription drugs;
> >
> > (C) Standards for provider admission to participate in a network, including reimbursement rates;

---

[3] Citations to the Code of Federal Regulations in this section II.A refer to the interim regulations that were later superseded by the final rules.

(D) Plan methods for determining usual, customary, and reasonable charges;

(E) Refusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy protocols); and

(F) Exclusions based on failure to complete a course of treatment.

Id. at § 2590.712(c)(4)(ii). With respect to nonquantitative treatment limitations, the IFRs expressed the parity requirement as follows:

> A group health plan may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical surgical/benefits in the classification, except to the extent that recognized clinically appropriate standards of care may permit a difference.

Id. at § 2590.712(c)(b)(i). For most plans, the IFRs became effective for the plan year beginning on or after July 1, 2010. Id. at § 2590.712(i)(1).

In the preamble to the IFRs, the Departments stated that the interim regulations did not address what some commenters had called the "scope of services" or "continuum of care" issue. See Preamble, IFRs Under the Parity Act, 75 Fed. Reg. at 5419 (Feb. 2, 2010). As summarized in the preamble, some commenters wanted the Departments to clarify that plans are not required to provide benefits for "any particular treatment or treatment setting (such as counseling or non-hospital residential treatment)" if such benefits are not offered for medical/surgical conditions.[4]

---

[4] RTCs and skilled-nursing facilities are sometimes referred to as "intermediate services." See Preamble, Final Rules Under the Parity Act, 78 Fed. Reg. 68240, 68246 (Nov. 13, 2013).

Id. Other commenters wanted the Departments to require plans to provide "the full scope of medically appropriate services" for mental-health conditions if the plan covers "the full scope of medically appropriate services to treat medical/surgical conditions." Id. A third group "requested that [the Parity Act] be interpreted to require that group health plans provide benefits for any evidence-based treatment." Id. The Departments invited comments regarding this dispute without resolving it:

> The Departments recognize that not all treatments or treatment settings for mental health conditions or substance use disorders correspond to those for medical/surgical conditions. The Departments also recognize that [the Parity Act] prohibits plans and issuers from imposing treatment limitations on mental health and substance use disorder benefits that are more restrictive than those applied to medical/surgical benefits. These regulations do not address the scope of services issue. The Departments invite comments on whether and to what extent [the Parity Act] addresses the scope of services or continuum of care provided by a group health plan or health insurance coverage.

Id. at 5416-17.

### B. Final Rules

On November 13, 2013, the Departments published final regulations applicable to plan years beginning on or after July 1, 2014. See Preamble, Final Rules Under the Parity Act, 78 Fed. Reg. 68240 (Nov. 13, 2013); 29 C.F.R. § 2590.712(i). The final rules retained the IFRs' six benefits classifications. See 29 C.F.R. § 2590.712 (c)(2)(ii). It added two new nonquantitative treatment limitations to the illustrative list set forth in the IFRs: (1) "[f]or plans with multiple network tiers (such as preferred providers and participating providers), network tier design;" and (2) "[r]estrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or

6

coverage." Id. at § 2590.712(c)(4)(C), (H) (emphasis added). The final regulations provide an example illustrating the requirement:

> (i) Facts. A plan generally covers medically appropriate treatments. The plan automatically excludes coverage for inpatient substance use disorder treatment in any setting outside of a hospital (such as a freestanding or residential treatment center). For inpatient treatment outside of a hospital for other conditions (including freestanding or residential treatment centers prescribed for mental health conditions, as well as for medical/surgical conditions), the plan will provide coverage if the prescribing physician obtains authorization from the plan that the inpatient treatment is medically appropriate for the individual, based on clinically appropriate standards of care.
>
> (ii) Conclusion. In this Example 9, the plan violates the rules of this paragraph (c)(4). Although the same nonquantitative treatment limitation—medical appropriateness—is applied to both mental health and substance use disorder benefits and medical/surgical benefits, the plan's unconditional exclusion of substance use disorder treatment in any setting outside of a hospital is not comparable to the conditional exclusion of inpatient treatment outside of a hospital for other conditions.

Id. at § 2590.712(c)(2)(ii)(C)(Example 9). The final rules are effective for plan years beginning on or after July 1, 2014. See id. at § 2590.712(i). HCSC denied Craft's request to preauthorize RTC treatment in the plan year beginning January 1, 2014. (See Trustwave Plan, Certificate Rider ("Effective Date: 01/01/2014").)

### II. Whether the Departments' Interim and Final Rules Are Inconsistent with the Parity Act

HCSC argues that the Parity Act does not apply to nonquantitative treatment limitations, contrary to Departments' interim and final rules. It relies on two canons of statutory interpretation: (1) *noscitur a sociis*; and (2) *ejusdem generis*. "Under the doctrine of *noscitur a sociis*, the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it." Commodity Futures Trading Com'n v.

7

Worth Bullion Group, Inc., 717 F.3d 545, 549 n.4 (7th Cir. 2013). The doctrine of *ejusdem generis* provides that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." United States v. Johnson, 655 F.3d 594, 603 (7th Cir. 2011) (citation and internal quotation marks omitted). The statute's definition of "treatment limitations" contains three examples: "frequency of treatment," "number of visits," and "days of coverage." 29 U.S.C. § 1185a(a)(3)(B)(iii). According to HCSC, these specific examples indicate that the phrase, "other similar limits," only applies to limitations that are also numerical in nature. (Def.'s Mem. at 6-10.)

The court declines at this time to limit the statute and regulations to quantitative limitations, only. The agencies charged with administering the statute have interpreted it to require parity as to both quantitative and nonquantitative limitations. HCSC's opening brief does not address the level of deference to which the Departments' interpretation is entitled. It cites Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) for the first time in its reply brief, and then only in passing. (See Def.'s Reply at 4-5.) Its failure to adequately address the deference issue creates several interpretative problems, one of which is whether the canons it relies on trump an otherwise reasonable interpretation.[5] For purposes of its motion to dismiss, HCSC has waived its argument that the Departments' interpretation is invalid. See Ripberger v. Corizon, Inc., 773 F.3d 871, 879 (7th Cir. 2014) (parties waive undeveloped and perfunctory arguments); Eberhardt v. Brown, 580 F. App'x 490, 491 (7th Cir. 2014) (parties

---

[5] Cf. Michigan Citizens for an Independent Press v. Thornburgh, 868 F.2d 1285, (D.C. Cir. 1989) ("Chevron implicitly precludes courts picking and choosing among various canons of statutory construction to reject reasonable agency interpretations of ambiguous statutes. If a statute is ambiguous, a reviewing court cannot reverse an agency decision merely because it failed to rely on any one of a number of canons of construction that might have shaded the interpretation a few degrees in one direction or another.).

8

waive arguments that they raise for the first time in a reply brief). Also, the court is not persuaded at this stage of the case that the RTC exclusion would pass muster even under HCSC's interpretation. The practical effect of the RTC exclusion is that Jane Doe receives fewer hours (or days) of coverage for medically necessary nursing care than, for example, an elderly person would receive to rehabilitate a broken hip. Essentially, HCSC argues that the issuer's characterization of the limitation is controlling. This is not the only reasonable interpretation of the phrase "other similar limits," and it is arguably at odds with the statute's purpose to achieve coverage parity whenever a plan offers both mental-health and medical/surgical benefits.

### III. Whether the Plaintiffs Have Stated a Claim for Relief Under the Statutes and IFRs

Even if the statute covers nonquantitative treatment limitations, HCSC argues that it does not apply to "treatment settings." (Def.'s Mem. at 10-13.) It relies on the fact that the Departments declined to address the "scope of services" issue in the IFRs to support its argument that the RTC exclusion is valid, at least as applied to benefits determinations predating the effective date of the Departments' final rules. The Parity Act is "self-implementing" and it applied at all times relevant to this case. See Preamble, IFRs Under the Parity Act, 75 Fed. Reg. at 5419. If the Departments had resolved the "scope of services" issue in the IFRs — either in favor of, or against, coverage — the court would have had to decide whether, or to what extent, their interpretation was entitled to deference. But they did not resolve the issue.[6] So, the court

---

[6] The Departments' decision not to apply the final rules retroactively is arguably relevant. HCSC has not, however, cited authority supporting the conclusion that it is dispositive. It cites Brazil v. Office of Personnel Management, Case No. 12–cv–02898–WHO, 2014 WL 1309935, *10 (N.D. Cal. Mar. 28, 2014) for the proposition that the final rules are not retroactive. First, the Brazil court's one-sentence discussion of the final rules is non-binding *dicta*. See id. (concluding that sovereign immunity barred the plaintiff's Parity Act claim against OPM). Second, it is irrelevant to the issue before the court. The final rules are not retroactive by their own terms. The question

still must decide whether HCSC violated the Parity Act when it enforced the RTC exclusion to deny Craft's preauthorization request. The RTC exclusion prevents beneficiaries like Jane Doe from receiving 24-hour supervision and care in a non-hospital setting. There is no corresponding limitation on the treatment of medical conditions. Cf. 29 U.S.C. § 1185a(a)(3)(A)(ii) (a plan must not impose treatment limitations on mental-health benefits that are not imposed on medical/surgical benefits). Assuming that the term "treatment limitations" is not limited to quantitative limitations, (see supra), the plaintiffs have stated a claim for relief under the Parity Act.

### IV. Whether Invalidating the RTC Exclusion Would Violate Due Process

Finally, HCSC argues that it would violate due process to find it liable for enforcing the RTC exclusion before the final regulations became effective. It relies on two cases: Christopher v. SmithKline Beecham Corp., 132 S.Ct. 2156, 2167-68 (2012) and Acosta v. Target Corp., 745 F.3d 853, 860 (7th Cir. 2014). In Christopher, the Supreme Court considered whether the FLSA's "outside salesman" exemption applies to pharmaceutical sales representatives. Christopher, 132 S.Ct. at 2161. In 1951, Congress amended the Federal Food, Drug, and Cosmetic Act to require a physician's prescription to obtain drugs "that are 'not safe for use except under the supervision of a practitioner.'" See id. at 2163, n.4 (quoting 21 U.S.C. § 353). Since that time, pharmaceutical companies have employed sales representatives to market their products to doctors. Id. at 2163-64. If successful, the sales representative obtains the doctor's non-binding commitment to prescribe the drugs in appropriate cases. Id. For decades, the Department of Labor ("DOL") had acquiesced in the industry's treatment of pharmaceutical sales representatives as "outside salesmen" exempt from the FLSA's overtime requirements. Id.

---

is whether the plaintiffs have stated a claim under the Parity Act, which *was* effective when HCSC denied Craft's request to preauthorize RTC services.

at 2168. In 2009, the DOL filed *amicus* briefs in private FLSA lawsuits taking the position — for the first time — that pharmaceutical sales representatives are *not* exempt. Id. at 2167. It ultimately took the position that an employee does not make a "sale" for purposes of the exemption "unless he actually transfers title to the property at issue." Id. at 2166; see also id. at 2166, n.14 (noting that the DOL had abandoned an earlier rationale for its new position). The Court first considered whether this interpretation was entitled to deference under Auer v. Robbins, 519 U.S. 452 (1997), which "ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation, even when that interpretation is advanced in a legal brief . . ." Christopher, 132 S.Ct. at 2166. This general rule does not apply, however, when the agency's interpretation: (1) "is plainly erroneous or inconsistent with the regulation;" and/or (2) "does not reflect the agency's fair and considered judgment on the matter in question." Id. (citation and internal quotation marks omitted). The latter condition may apply if the agency's interpretation: (1) "conflicts with a prior interpretation;" (2) appears to be "nothing more than a convenient litigating position;" and/or (3) is a "*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack." Id. (citations and internal quotation marks omitted). Applying these principles, the Supreme Court concluded that the DOL's interpretation of the "outside salesman" exemption was not entitled to Auer deference. It reasoned that the new interpretation would "impose massive liability" that the respondent could not have reasonably anticipated. Id. at 2167. The statutes and the regulations, which had been in place for decades in substantially the same form, did not provide clear notice to employers that the exemption only applies to employees who "actually transfer[] title to the property at issue." Id. It was "[e]ven more important" that the agency had acquiesced for decades in the industry's practice of treating pharmaceutical sales representatives as exempt. Id. at 2168. The Court further concluded that

the DOL's interpretation was not persuasive under the less deferential standard described in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).[7]  Requiring employees to transfer title to property to qualify for the exemption was "flatly inconsistent with the FLSA, which defines 'sale' to mean, *inter alia*, a 'consignment for sale.'" Id. at 2169.  Construing the statute and the regulations without any deference to the DOL's interpretation, the Court held that pharmaceutical sales representatives fall within the FLSA's "outside salesman" exemption. Id. at 2172.

Acosta is somewhat closer to the facts before the court.  In 2000, Target began a campaign to "upgrade" customer "Guest Cards," useable only in Target stores, to "Target Visa Cards," all-purpose credit cards that customers could use anywhere.  Id.  It sent unsolicited Visas to more than 10 million current and former Guest Card owners, and simultaneously closed their Guest Card accounts.  Id.  Among other claims, the plaintiffs alleged that Target did not comply with the Truth In Lending Act's ("TILA") disclosure requirements for new credit-card accounts. Id. at 859.  Under the statute in place during the relevant time period — 2004-2007 — it was unclear whether credit-card substitutions triggered the disclosure requirements applicable to new accounts, and the Federal Reserve Board's regulations were silent on the issue.  Id.  In 2009, Congress amended TILA, after which the Board published new commentary clarifying the statute's application to credit-card substitutions.  Id.  The district court held that the new commentary, which the parties agreed would have required Target to provide new-account disclosures in connection with its substitution program, did not apply to conduct predating the 2009 TILA amendment.  Id. at 859-60.  The plaintiffs waived any contrary argument by failing

---

[7] Under Skidmore, agency interpretations are entitled to more or less deference, depending on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ." Skidmore, 323 U.S. at 140; see also United States v. Mead Corp., 533 U.S. 218, 228 (2001).

to raise the issue on appeal. Id. at 860. The court then considered whether Target have treated the substituted Visas as new accounts under TILA and the regulations as they existed in 2004-2007. Id. In the absence of any contrary indication in the statute and/or the regulations, the court found that Target reasonably concluded that the term "account" broadly referred to the "total relationship between the parties." Id. Applying that interpretation, the Visa substitutions constituted changes to preexisting accounts. Id. Citing Christopher, the court concluded that it would be unfair to "hold Target liable for a change it could not predict." Id.

This case differs from Christopher and Acosta in important respects. First, the district courts in those cases decided the issues before them on summary judgment. See Christopher, 132 S.Ct. at 2164; Acosta, 745 F.3d at 857. In this case, the court does not have the benefit of an evidentiary record, and the deference question central to the Christopher Court's analysis is undeveloped. (See supra.) Second, it is unclear at this point whether HCSC can establish unfair surprise sufficient to support a due-process defense. Here, there is nothing comparable to the decades of agency acquiescence that the Christopher Court considered an important factor in evaluating whether the DOL's new tack was fair. Also, unlike the defendant in Acosta, HCSC was not operating in a legal vacuum. The Departments construed the statute to apply to nonquantitative treatment limitations, and merely deferred decision on the scope-of-services issue. The Departments later explained in the preamble to the final regulations that they "did not intend that plans and issuers could exclude intermediate levels of care covered under the plan from the [Parity Act's] parity requirements." 78 Fed. Reg. 68240-1, 68247. HCSC contends that this is a *post hoc* rationalization, (see Def.'s Reply at 11), but it is arguably the most reasonable conclusion to draw from the Departments' decision not to address the issue in the IFRs. It would be a stretch to conclude from the Departments' request for comments that it was authorizing

13

issuers to enforce treatment-setting limitations. They simply were not prepared to issue guidance at that time. Also, in Acosta, the Federal Reserve Board published new commentary after Congress amended TILA. See Acosta, 745 F.3d at 859-60. Here, the same statutory language has been in place throughout the relevant time period. There was a foreseeable risk, then, that a court might construe the statute to impose parity with respect to limitations on treatment settings. See Rivers v. Roadway Express, Inc., 511 U.S. 298, 312 (1994) ("The essence of judicial decisionmaking — applying general rules to particular situations — necessarily involves some peril to individual expectations because it is often difficult to predict the precise application of a general rule until it has been distilled in the crucible of litigation."). In sum, the court concludes that HCSC's due-process defense requires further factual and legal development.

## CONCLUSION

For the reasons stated herein, the Court denies the defendant's motion to dismiss.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 3/25/2015